UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

MATTHEW D. HOLCOMB,

                     Plaintiff,

        v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                  Defendant.

Case No.: 6:13-cv -01484 AC

FINDINGS AND
RECOMMENDATION

ACOSTA, Magistrate Judge:

     Plaintiff Matthew D. Holcomb ("Holcomb") filed this action under § 205(g) of the Social

Security Act (the "Act") as amended, 42 U.S.C. § 405(g), to review the final decision of the

Commissioner of Social Security (the "Commissioner") who denied him social security disability

insurance benefits ("DIB") and supplemental security income ("SSI")(collectively "Benefits").

Based on a careful review of the record, the Commissioner's decision should be affirmed and this

FINDINGS AND RECOMMENDATIONS        1                              {JWM}

case dismissed.

*Procedural Background*

On or about April 13, 2010, Holcomb filed an application for DIB alleging an onset date of May 15, 2009. On or about April 20, 2010, Holcomb applied for SSI alleging the same onset date. The applications were denied initially, on reconsideration, and by Administrative Law Judge James Yellowtail (the "ALJ") after a hearing. The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

*Factual Background*

Holcomb is thirty-one years old. He graduated from high school. His past work experience includes being a janitor, dishwasher, cook, delivery driver, inventory clerk, and field researcher. Holcomb has not been involved in a successful work attempt since May 15, 2009. Holcomb alleges disability because of migraines, seizures, depression, panic disorder, post-traumatic stress disorder, and pain. Holcomb last met the insured status requirements entitling him to DIB on March 31, 2014.

I.    Hearing Testimony.

At the June 11, 2012, hearing (the "Hearing"), a neurologist, James Haynes, M.D., testified about Holcomb's seizures, migraine headaches, Tourette's syndrome, and limitations on Holcomb's activity as a result of those impairments. Dr. Haynes has never treated Holcomb in person and testified after reviewing Holcomb's medical records. (Admin. R. at 35.) Dr. Haynes discussed Holcomb's seizures first, noting that it is "51-49 in favor of a true diagnosis" of a seizure disorder. (Admin. R. at 39.) Further, Dr. Haynes noted that Holcomb is not at the end-of-the-line concerning treatment for a seizure disorder, and that with good treatment it would be highly unusual for a problem similar to Holcomb's to continue unabated. (Admin. R. at 39.)

FINDINGS AND RECOMMENDATIONS       2                          {JWM}

Dr. Haynes also testified regarding Holcomb's migraine headaches and Tourette's. (Admin. R. at 34-44.) Dr. Haynes stated Holcomb's headache disorder was peculiar and demonstrated a "funny pattern." (Admin. R. at 41.) Again, Dr. Haynes noted that Holcomb had not explored the full range of possible treatments and the migraine headaches responded well to certain medications. (Admin. R. at 41.) In addition, Dr. Haynes indicated a diagnosis of Tourette's syndrome was not supported by Holcomb's medical records. (Admin. R. at 41.) Finally, Dr. Haynes noted that, based on his review of the record, Holcomb did not meet any of the listings promulgated by the Social Security Administration. (Admin. R. at 41-42.) However, Dr. Haynes did provide a caveat: if Holcomb were actually experiencing seizures at the frequency he claimed, "every other day or daily," Holcomb would meet listing 11.03 for non-convulsive epilepsy. (Admin. R. at 42.) Dr. Haynes identified listing 11.03 as the only potential listing Holcomb could qualify for and did not find Holcomb's symptoms to be medically equivalent to any listing. (Admin. R. at 42.)

Dr. Haynes testified that Holcomb's condition limited the types of activity he could participate in. First, Dr. Haynes noted that Holcomb should not drive either commercially or for personal reasons. (Admin. R. at 43.) Second, Dr. Haynes stated that Holcomb should never work at unprotected heights, with power tools, or near moving machinery. (Admin. R. at 43.) Finally, Dr. Haynes noted the record did not reflect any physical limitations in areas like lifting or bending. (Admin. R. at 43.)

Dr. Haynes responded to a hypothetical posed by Holcomb's attorney. Howard Neibling, P.E., employed Holcomb in the past and wrote a letter describing Holcomb's sudden change in ability to perform his job tasks:

In the spring of 2009, Matt's physical and mental performance deteriorated

FINDINGS AND RECOMMENDATIONS      3                                    {JWM}

> significantly. He tired easily, was noticeably weaker, was noticeably less sharp
> mentally, and was unable to work out in the sun because it trigger[s] migraine
> headaches. He still wanted to do good work but was physically and mentally unable
> to function at an acceptable level, so he was no longer able to work for me.

(Admin. R. at 44.) Holcomb's attorney asked Dr. Haynes if that description was consistent with his

testimony at the hearing. (Admin. R. at 44-46.) Dr. Haynes replied that the description was

consistent with his testimony. (Admin. R. at 46.)

Holcomb testified to his education and work experience, mental and physical condition, and

treatment of his condition at the Hearing. Holcomb completed high school and two years of college.

(Admin. R. at 48.) In addition, Holcomb testified that his most recent relevant work experience was

as an inventory clerk at Wal-Mart and a field researcher for a state university. (Admin. R. at 49.)

Holcomb testified extensively to his physical and mental condition. Holcomb claims he has

had a severe migraine headache for the last three years, after feeling a pop in his head while stocking

shelves at a Wal-Mart. (Admin. R. at 50.) He also claims to have "panic attacks, sensitivity to light

and sound, sleep disorders, and some level of agoraphobia," all conditions that keep him from

working. (Admin. R. at 51.) Holcomb did not list his seizure disorder when the ALJ asked the

reasons for his inability to work. (Admin. R. at 51.) Instead, Holcomb described the seizures as

"more socially awkward." (Admin. R. at 52.) Further, Holcomb described his seizures as occurring

daily or every other day, with roughly one each month cause a loss of consciousness. (Admin. R.

at 52.) However, after he loses consciousness, Holcomb is able to function and communicate, and

his memory loss is limited to the event itself. (Admin. R. at 52-53.) Holcomb also told the ALJ that

he had not reported the daily convulsions to his doctors because he can deal with that condition more

easily than his other impairments. (Admin. R. at 53.) When asked why it would be hard to hold

down a job, Holcomb answered, "[b]ecause of my sleep schedule, because of depression, the panic attacks, [and] the social anxiety." (Admin. R. at 60-61.)

Holcomb also testified to the effectiveness of the treatment he receives. Initially Holcomb took medication for his headaches but ceased because the medication left him with a rash. (Admin. R. at 53-54.) Holcomb also testified that he stopped using Percocet for his headaches after eight to ten months and moved to Oregon in part to get medical marijuana as an alternative. (Admin. R. at 57.) Holcomb stated that marijuana has helped him with both the migraines and some of his anxiety issues. (Admin. R. at 57.) Also, Holcomb takes Zoloft and it effectively helps his depression. (Admin. R. at 54.) Further, Holcomb now uses a CPAP machine for his sleep disorder and noticed positive results. (Admin. R. at 55 and 57.) Finally, the counseling Holcomb receives to treat his agoraphobia has helped with that condition. (Admin. R. at 55.)

Holcomb's mother, Fonda Kay Holcomb, also testified to Holcomb's condition and day-to-day activities based on her observations. Ms. Holcomb currently resides with Holcomb and has for the past nine years. (Admin. R. at 63.) She stated that except for doctor appointments, Holcomb is housebound if the sun is out. (Admin. R. at 64.) Further, Holcomb always has headaches and those headaches subside only when Holcomb sleeps. (Admin. R. at 65.) He also has petite mal seizures "where he'll just be talking and then stop for a few seconds and then pick right back up . . . ." (Admin. R. at 66.) Ms. Holcomb observed daily episodes of facial tics and barking which she associates with Tourette's syndrome. (Admin. R. at 66.) She also said that Holcomb can concentrate for approximately fifteen minutes before his migraines increase in intensity. (Admin. R. at 67.) Finally, Ms. Holcomb testified that Holcomb has an irregular sleep schedule and only sleeps for three to four hours at a time. (Admin. R. at 67.)

FINDINGS AND RECOMMENDATIONS      5                                    {JWM}

Jay Stutz, a vocational expert, testified to Holcomb's work history and suitable jobs for Holcomb with his limitations. (Admin. R. at 69.) Mr. Stutz identified three jobs in the national and regional economy that Holcomb could perform with his limitations: cleaner 2, janitor, and budder. (Admin. R. at 73.) Mr. Stutz further testified that an employee with those jobs would be expected to be at work consistently without a high frequency of missed work days. (Admin. R. at 74.) Finally, Mr. Stutz indicated that an individual who experiences a headache so severe that the individual cannot function two to three times a week with a duration of up to three hours, could not sustain employment. (Admin. R. at 75.)

## II.    Medical Evidence.

Holcomb visited the emergency room in Twin Falls, Idaho, on June 1, 2009, complaining of a headache. (Admin. R. at 242.) Holcomb reported that he had a throbbing, right-sided headache for the previous fourteen days with bouts of photophobia and phonophobia. (Admin. R. at 242.) The treating physician noted Holcomb's CT scan results indicated no abnormality. (Admin. R. at 243.) On November 28, 2009, Holcomb returned to the emergency room in Twin Falls again complaining of a headache, rating the pain as ten-out-of-ten. (Admin. R. at 246.) Records from that visit indicate Holcomb visited Kenneth Brait, M.D., in-between emergency room visits, and Dr. Brait thought Holcomb had sleep apnea from which the headaches resulted. (Admin. R. at 246.)

Holcomb first visited Dr. Brait on November 3, 2009. (Admin. R. at 257.) Dr. Brait noted Holcomb needed an EEG to better diagnose his seizure condition. (Admin. R. at 258.) Dr. Brait also determined Holcomb needed a polysomnagram to test for sleep apnea and additionally thought Holcomb could be experiencing headaches as a side effect of that condition. (Admin. R. at 258.) On December 30, 2009, Holcomb visited Dr. Brait again. (Admin. R. at 248.) Holcomb had been

FINDINGS AND RECOMMENDATIONS     6                    {JWM}

using a CPAP machine at this point, yet his headaches persisted. (Admin. R. at 248.) Dr. Brait was concerned with Holcomb's weight, headaches, and seizures and prescribed Topamax in hopes of dealing with all three. (Admin. R. at 248.) Holcomb's EEG showed a "left temple seizure focus." (Admin. R. at 248.)

On February 10, 2010, Holcomb visited Paul Harman, LCSW, for counseling. (Admin. R. at 272.) Dr. Harman noted Holcomb's history of seizures and struggles to function in everyday life. (Admin. R. at 272-74.) Holcomb reported having seizures until he was eight and those seizures returned when he was fifteen or sixteen but were of reduced severity. (Admin. R. at 272.) Holcomb also reported that he had headaches everyday that were "about an [eight] or [nine] on a scale of [one] to [ten], and every once in a while, he [would] have a good day that is a [four] or [five] on the scale." (Admin. R. at 272.) Further, Holcomb stated he stopped using Topamax because it caused him to become "very violent, very volatile, and explosive." (Admin. R. at 272.) Dr. Harman planned on continuing to counsel Holcomb and gave him a Global Assessment Functioning score of 54.[1] (Admin. R. at 273-74.)

On February 17, 2010, Dr. Brait reassessed Holcomb's medication. (Admin. R. at 276.) Dr. Brait stopped Holcomb's Topamax use and prescribed generic Depakote in hopes that it would reduce Holcomb's headaches and calm his personality without fluctuation. (Admin. R. at 276.) Dr. Brait also characterized Holcomb's seizures: "He has shaking spells daily which probably are not seizures." (Admin. R. at 276.)

---

[1]According to the Diagnostic and Statistical Manual of Mental Disorder, Fourth Edition, page 34, a GAF of 60-51 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job).

Holcomb visited Marcus Farley, QMHP, for counseling about panic attacks on May 20, 2011. (Admin. R. at 343.) Dr. Farley diagnosed Holcomb with "Panic Disorder with Agoraphobia" and "Anxiety Disorder due to a General Medical condition" on May 31, 2011. (Admin. R. at 375.) During the initial visit, Dr. Farley set a goal of reducing the frequency of Holcomb's panic attacks from four-to-five a day to no more than one a day. (Admin. R. at 375.) Holcomb met that goal using the techniques Dr. Farley taught him. (Admin. R. at 345.) Dr. Farley reset the goal to be a decrease in panic attacks from five weekly to no more than two a week during Holcomb's next evaluative visit on August 29, 2011. (Admin. R. at 345.) Dr. Farley and Holcomb also established three other goals for Holcomb's treatment. First, Dr. Farley wanted to "reduce the number of days each week in which client feels overwhelmed by anxiety and/or stress from [three] days/week to no more than [one] day/week." (Admin. R. at 346.) Second, Holcomb would "increase the frequency of 'talking out' frustrations or strong emotion reactions before they 'build up' from [twenty-five percent] of the time to [seventy-five percent] of the time." (Admin. R. at 346.) Third, Dr. Farley wanted Holcomb to "decrease intensity of emotional 'outbursts' from [nine out of ten] to [five out of ten]." (Admin. R. at 346.)

Holcomb began seeing Steven Yoder, M.D., in Eugene, Oregon, on February 11, 2011. (Admin. R. at 427.) Holcomb reported having ongoing seizures, occurring every five minutes, increased anxiety, and constant migraines. (Admin. R. at 427.) Dr. Yoder noticed Holcomb occasionally "jerked" in the head and neck during the visit accompanied by a "grunting sound." (Admin. R. at 428.) Dr. Yoder assessed Holcomb as having Tourette syndrome, but noted that Holcomb would need another opinion in order to get proper treatment. (Admin. R. at 428-29.) During Holcomb's appointment on February 28, 2011, Dr. Yoder noted "[t]oday he continued to

show some ticks, especially when I was first with him. Once we got to talking, those seemed to stop." (Admin. R. at 425.) Dr. Yoder also prescribed Zoloft to deal with Holcomb's depression. (Admin. R. at 425.)

On April 1, 2011, Holcomb saw James Kiley, M.D., for a neurological consultation. (Admin. R. at 420.) Holcomb complained of "severe pain in his head that often occurs with blacking out." (Admin. R. at 420.) Dr. Kiley stated Holcomb's seizure disorder "is probably legitimate based on his abnormal EEG and his history of childhood epilepsy." (Admin. R. at 422.) Regarding the migraines, Dr. Kiley noted that proper preventative medicine needs to be tried and that marijuana is not the answer. (Admin. R. at 422.) Dr. Kiley also assessed Holcomb's atypical head and neck movements and grunting:

> During the examination, the patient starts to have episodes where he starts shouting loud words, typically profane words. He also snaps his head back occasionally. As I have seen several patients with Tourette's syndrome, this seems somewhat atypical [. . .] I am not willing to diagnose him with Tourette's syndrome. It almost seems a little too perfect the way he is manifesting these signs and symptoms. Furthermore, it would be quite odd for him to develop Tourette's after the age of [twenty-one]. This would be quite an unusual phenomenon.

(Admin. R. at 422.) On a subsequent visit with Holcomb, Dr. Kiley noted that Holcomb had a rash as a result of taking Verapamil for his migraines and did not demonstrate any motor or verbal tics. (Admin. R. at 412.)

Holcomb saw Ralph Fillingame, M.D., on November 10, 2011. (Admin. R. at 380.) Dr. Fillingame diagnosed Holcomb with type-two diabetes. (Admin. R. at 381.) On November 21, 2011, Dr. Fillingame noted that Holcomb should not continue with Verampamil or any other drugs to treat his headaches until December of that year when he would consult with a dermatologist. (Admin. R. at 379.)

FINDINGS AND RECOMMENDATIONS      9                              {JWM}

On March 7, 2012, Holcomb visited Ryan Scott, Ph. D., and explained his history with drugs and alcohol. Holcomb told Dr. Scott that he first used alcohol at age twelve and last used in May of 2009. (Admin. R. at 435.) Holcomb also began using marijuana at age twelve and currently uses it eight to twelve times a day. (Admin. R. at 435.) Between the ages of fifteen and eighteen, Holcomb used methamphetamine. (Admin. R. at 435.) Holcomb used cocaine between the ages of fifteen and nineteen. (Admin. R. at 435.) Finally, Holcomb told Dr. Scott that prior to July 2010, he had been addicted to prescription opiates. (Admin. R. at 435.)

III.    ALJ Decision.

In his opinion, the ALJ determined Holcomb has not engaged in substantial gainful activity since May 15, 2009, the alleged onset date. (Admin. R. at 15.) The ALJ found Holcomb has severe impairments of migraines, a history of partial complex seizures, atypical movement disorder, major depression disorder, post-traumatic stress disorder, and panic disorder with agoraphobia. (Admin. R. at 15.) However, the ALJ ruled out learning disorder, sleep apnea, and obesity. (Admin. R. at 15.) At step three, the ALJ found that Holcomb does not have an impairment or combination of impairments that meets or equals a listed impairment. (Admin. R. at 15.)

At step four, the ALJ established Holcomb's residual functioning capacity. (Admin. R. at 17-24.) Holcomb is able to complete work at the full range of exertional levels with the following nonexertional limits: Holcomb should not drive; be exposed to heights or moving machinery; climb ropes, ladders, or scaffolds; or have contact with the general public. (Admin. R. at 17-18.) Further, the ALJ found Holcomb capable of performing unskilled work with routine repetitive tasks with simple instructions. (Admin. R. at 18.) The ALJ found that Holcomb did not have any past relevant work. (Admin. R. at 24.)

At step five, the ALJ considered Holcomb's symptoms and the extent to which the symptoms are reasonably consistent with objective medical evidence. (Admin. R. at 18.) Ultimately, the ALJ determined Holcomb could successfully adjust to and perform the tasks required of several jobs with significant numbers in the national and regional economy, such as cleaner, janitor, or budder. (Admin. R. at 24-25.) Thus, he found Holcomb not disabled. (Admin. R. at 24-25.)

The ALJ found Holcomb's statements concerning the intensity and limiting effects of his alleged symptoms to be less than fully credible. (Admin. R. at 22.) First, the ALJ found Holcomb's testimony regarding the frequency of his seizures to lack credibility. (Admin. R. at 23.) Holcomb claims to experience seizures where he loses consciousness and experiences convulsions, yet admitted he does not experience grand mal seizures and Dr. Kiley diagnosed Holcomb with partial complex seizures only. (Admin. R. at 23.) In addition, Dr. Haynes testified that if Holcomb's statements regarding his seizures were correct, Holcomb would qualify for listing 11.03. (Admin. R. at 23.) However, the ALJ found no medical evidence that Holcomb's statements regarding the severity and intensity of the seizures are correct. (Admin. R. at 23.)

Second, Holcomb claimed to have Tourette's syndrome. (Admin. R. at 23.) Based on the reports of Dr. Kiley, the ALJ found Holcomb's claim to lack credibility because Dr. Kiley found Holcomb's description a little too perfect and stated it would be quite odd for someone to develop Tourette's after the age of twenty-one. (Admin. R. at 23.) The ALJ also used his own observations to discredit Holcomb. (Admin. R. at 23.) Holcomb did not exhibit any of the described behavior during the hearing despite Holcomb's claim that these episodes happen multiple times per day. (Admin. R. at 23.)

The ALJ ruled out Holcomb's claim of a learning disorder. (Admin. R. at 23.) Holcomb

FINDINGS AND RECOMMENDATIONS       11                              {JWM}

completed high school, finished two years of college, and had a long work history. (Admin. R. at 23.) The fact that Holcomb's alleged learning disorder did not prevent those activities, when combined with no medical diagnosis, led the ALJ to rule out any learning disorder. (Admin. R. at 23.)

The ALJ gave little weight to the testimony of Ms. Holcomb, Mr. Farley, Mr. Harmon, Ms. Clark, Ms. Neibling, and Dr. Neibling (the "Lay Witnesses") for three reasons. (Admin. R. at 23.) First, the ALJ found the Lay Witnesses lacked the qualifications of Dr. Scott and Dr. Haynes. (Admin. R. at 23.) Second, Holcomb's past use of methamphetamine, cocaine, marijuana, and opiates complicated and left unclear the question of how mush the drug use contributed to the concentration problems the Lay Witnesses observed. (Admin. R. at 23.) Finally, the ALJ found their testimony entitled to little weight to the extent it relied on Holcomb's subjective statements.

*Standard of Review*

This court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusions." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld, even where the evidence can support either affirming or reversing the ALJ's conclusion. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

The initial burden of proof rests upon the claimant to establish disability. *Howard v. Heckler,* 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1502, 416.920. First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Yuckert,* 482 U.S. at 140; 20 C.F.R. §§ 404.1520(b), 416.920(b).

In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert,* 482 U.S. at 140-41; *see* 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert,* 482 U.S. at 140-41; *see* 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert,* 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Secretary. In step five, the Commissioner must establish that the claimant can perform other work. *Yuckert,* 482 U.S. at 141-42; *see* 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets

FINDINGS AND RECOMMENDATIONS    13                    {JWM}

this burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled.  20 C.F.R. §§ 404.1566, 416.966.

*Discussion*

Holcomb asserts the ALJ erred by: 1) improperly discrediting Holcomb's testimony; 2) improperly dismissing Dr. Haynes's opinion that Holcomb met listing 11.03; 3) improperly rejecting lay testimony; and 4) relying on an improper hypothetical posed to the vocational expert.  Holcomb asks this court to reverse the alleged errors at steps three, four, and five, and award benefits.  In the alternative, Holcomb requests this court to remand for the errors to be corrected.  The Commissioner urges that the ALJ's decision is supported by substantial evidence and is free of harmful legal error. Therefore, this court should affirm the ALJ's decision.

I.      Holcomb's Testimony.

Holcomb argues that the ALJ improperly rejected his testimony without offering a specific, clear, and convincing reason for doing so.  The Commissioner responds by asserting that the ALJ made a specific finding that Holcomb was not credible supported by the ALJ's own observations, and Holcomb's statements being exaggerated or inconsistent with the reports of Dr. Kiley and Dr. Yoder.  To find Holcomb's testimony unreliable, the ALJ must make "a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

ALJs perform a two-step analysis when determining the credibility of a claimant's statements about the severity of his or her symptoms.  First, the ALJ looks for "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged . . . . " *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996) (quoting *Bunnell*

FINDINGS AND RECOMMENDATIONS    14                                        {JWM}

*v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)) (internal quotation marks omitted).  Second, once the initial threshold is passed by the claimant, the ALJ can only "reject the claimant's testimony about the severity of [his or her] symptoms only by offering specific, clear[,] and convincing reasons for doing so." *Id.* at 1284.  Specifically, the ALJ must identify "what testimony is not credible and what evidence undermines the claimant's complaints." *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (citing *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

The ALJ offered clear, convincing, and specific reasons for discrediting Holcomb's testimony of seizure symptoms.  Specifically, the ALJ identified the aspects of Holcomb's testimony he found to lack credibility, Tourette's syndrome and the intensity and frequency of the seizures, and then offered clear and convincing evidence to support that determination.  Inconsistencies within the record can be a clear and convincing reason for discrediting a claimant's testimony.  *See Smolen*, 80 F.3d at 1284.

The ALJ qualified the extent to which he rejected Holcomb's subjective testimony.  The ALJ concluded that Holcomb had a residual functional capacity limited only by restrictions on driving, exposure to heights and machinery, and the preclusion of the necessity of climbing ropes, ladeders, or scaffolds.  When the ALJ considered Holcomb's testimony, he clarified: "I find that the record provides full support for the residual functional capacity and that the claimant's subjective statements and allegations are not credibly supported by the weight of the evidence to the extent inconsistent with that conclusion." (Admin. R. at 24)  Essentially, the ALJ made a general credibility determination, which determination is supported by substantial evidence in the record.  Thus, the ALJ did not err. *Thomas v. Barnhart*, 278 F.3d 947, 958-60 (9th Cir. 2002) (upholding ALJ's finding that a claimant generally lacks credibility as a permissible basis for rejecting

claimant's testimony).

First, the ALJ noted that Holcomb reversed his own statement that he often loses consciousness and experiences convulsions and admitted he experiences, at most, momentary lapses. Additionally, Dr. Kiley diagnosed Holcomb with partial complex seizures and eventually put Holcomb's seizure medication on hold because of a normal EEG. "Contradiction with the medical record is a sufficient reason for rejecting a claimant's subjective testimony." *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)). By noting the inconsistency of Holcomb's testimony with the record and how Holcomb's testimony was contradicted by the medical record, the ALJ offered clear and convincing reasons for rejecting Holcomb's testimony of seizures.

The ALJ did not err in discrediting Holcomb's testimony regarding Tourette's syndrome. The ALJ found Holcomb's testimony regarding multiple daily Tourette's episodes lacked credibility. Dr. Kiley stated the claimant's description is "a little too perfect for Tourette's" and that condition rarely manifests after the age of twenty-one. Holcomb was twenty-seven when he first noted the symptoms. Further, both Dr. Yoder and Dr. Kiley noted that the tic behavior was inconsistent, went away once Holcomb engaged in conversation, and Dr. Kiley ultimately diagnosed Holcomb with "atypical movement disorder" instead of Tourette's. The ALJ adopted Dr. Kiley's position on the condition, which contradicted Holcomb's testimony. As noted *supra*, a contradiction with the medical record is a sufficient reason to reject a claimant's testimony. Therefore, the ALJ offered a clear and convincing rationale for rejecting Holcomb's testimony of Tourette's symptoms.

Holcomb further argues that the ALJ erred by not considering Holcomb's testimony regarding migraines. There is no evidence in the ALJ's decision that he did not consider Holcomb's

migraines in establishing Holcomb's residual functional capacity. However, even if the ALJ rejected that testimony, this court would not be able to overturn the ALJ's credibility determination in light of the other substantial evidence the ALJ offered. *See Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1196-97 (9th Cir. 2001) (upholding ALJ's credibility determination of claimant's subjective testimony when error is present but ALJ offered other substantial evidence of claimant's lack of credibility). This court must affirm an ALJ's credibility decision if it is appropriately based upon substantial evidence. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). Here, the ALJ made a general finding that Holcomb's testimony was not credible, and that finding is supported by substantial evidence. Therefore, the ALJ did not err in his treatment of Holcomb's testimony regarding his migraines.

II.    Listing 11.03.

Holcomb further asserts that the ALJ erred at step three in determining his impairments did not meet listing 11.03. Holcomb asserts that the ALJ impermissibly rejected Dr. Haynes's testimony by finding Holcomb did not meet listing 11.03 because Dr. Haynes's testimony was supported by medical evidence in the record. Holcomb also contends the ALJ erred by not considering how all of Holcomb's symptoms related to his seizures contrary to guidance provided by the Social Security Administration. To be presumptively disabled under listing 11.03, Holcomb has the burden of proving:

> Epilepsy--nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

FINDINGS AND RECOMMENDATIONS    17    {JWM}

20 C.F.R Part 404, Subpart P, Appendix 1, § 11.03.  The following is the exchange between the ALJ

and Dr. Haynes in relation to listing 11.03:

> Q: And based on your review of the first 15 exhibits, do you have an opinion as to
> whether the claimant's conditions within your field would meet or medically equal
> any of the relevant listings?
>
> A: Well, if he's been having these spells at the frequency that he says he has - - every
> other day or daily - - he does meet the 11.03 for non-convulsive epilepsy.  And I
> would say that that's the only listing.  There's no listing for migraine.  I don't think
> that's appropriate . . . .

(Admin. R. at 41-42.)

The ALJ did not improperly disregard Dr. Haynes's testimony in determining Holcomb failed

to prove he met listing 11.03.  In fact, the ALJ's decision is consistent with Dr. Haynes's statement.

Dr. Haynes stated that Holcomb's qualification for listing 11.03 was conditioned on believing

Holcomb's testimony of the frequency of his seizures.  As discussed *supra*, the ALJ did not err in

rejecting Holcomb's testimony concerning the frequency and severity of his seizure symptoms.

Therefore, once the ALJ made the determination to reject Holcomb's testimony concerning the

seizures, Holcomb did not meet listing 11.03 as outlined by Dr. Haynes's statements.  Even if Dr.

Haynes had concluded Holcomb met listing 11.03 based on Holcomb's subjective statements, the

ALJ could have made the determination he did.  *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989)

("The ALJ thus disregarded Dr. Bliss' opinion because it was premised on [claimant's] own

subjective complaints, which the ALJ had already properly discounted. This constitutes a specific,

legitimate reason for rejecting the opinion of a treating physician.").

Holcomb also argues the ALJ erred in not finding Holcomb's migraines medically equivalent

to listing 11.03.  Holcomb relies on POMS DI 24505.015 § 7(b) to illustrate how migraines may be

FINDINGS AND RECOMMENDATIONS      18                              {JWM}

found to be medically equivalent to listing 11.03:

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis. Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain. She has nausea and photophobia and must lie down in a dark and quiet room for relief. Her headaches last anywhere from [four] to [seventy-two] hours and occur at least [two] times or more weekly. Due to all of her symptoms, she has difficulty performing her ADLs. The claimant takes medication as her doctor prescribes. The finding of the claimant's impairment are very similar to those of 11.03, Epilepsy, non-convulsive. Therefore, 11.03 is the most closely analogous listed impairment. Her findings are at least of equal medical significance as those of the most closely analogous listed impairment. Therefore, the claimant's impairment medically equals listing 11.03.

The ALJ did not err by finding Holcomb's migraine symptoms were not medically equivalent to listing 11.03. While this example of determining medical equivalency is factually similar to this case, the "POMS constitutes an agency interpretation that does not impose judicially enforceable duties on either this court or the ALJ." *Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1073 (9th Cir. 2010) (citing *Lowry v. Barnhart*, 329 F.3d 1019, 1023 (9th Cir.2003)). Furthermore, "[s]uch agency interpretations are entitled to respect, but only to the extent that those interpretations have the power to persuade." *Id.* (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000)) (internal quotation marks omitted).

This court is not persuaded that the offered section of the POMS required the ALJ to determine that Holcomb's migraines were medically equivalent to listing 11.03. Holcomb describes daily migraine headaches which usually rate between eight or nine on a pain scale of one-to-ten and allow him to concentrate for only fifteen minutes at a time. Ms. Holcomb indicated Holcomb avoids sunlight and obtains relief from the headaches only when he sleeps. However, Holcomb does not complain of auras, alteration of awareness, or nausea, which differentiates the symptoms of his migraine headaches from those described in the POMS, making Holcomb's appear less severe.

FINDINGS AND RECOMMENDATIONS    19                                    {JWM}

Further, Dr. Haynes questioned Holcomb's headache disorder, describing it as peculiar and demonstrating a funny pattern, supporting any determination by the ALJ that Holcomb's testimony regarding the severity of his migraine headaches is not entirely credible. Finally, Holcomb elected to stop using medications prescribed to alleviate his migraine headaches when they resulted in a rash, and when he moved to Oregon, in part to self-treat with medical marijuana. Dr. Kiley specifically noted that marijuana is not the answer and that proper preventative medicines exist. Accordingly, Holcomb has not taken medication as prescribed by his doctor, again distinguishing him from the factual situation addressed in the POMS.

Moreover, the cited portion of the POMS does not appear to be anything more than an example of how the Social Security Administration could potentially reach a determination of medical equivalency. Neither Dr. Haynes nor the Social Security Administration determined that Holcomb's symptoms were medically equivalent to listing 11.03. Holcomb has pointed to no authority requiring the ALJ to make that determination independent of or in contradiction of Dr. Haynes. The ALJ did not err at step three.

III.    Rejection of Lay Opinion.

Holcomb asserts the ALJ erred by rejecting the lay testimony of the Lay Witnesses. Holcomb contends this is error in that the ALJ rejected the Lay Witnesses testimony because they "lack the qualifications of [Dr. Scott] and [Dr. Haynes], and because of the claimant's substance abuse and overall lack of credibility," instead of a germane reason specific to each witness. When an ALJ rejects the testimony of a lay witness "he [or she] must give reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir.1993). Mr. Farley and Ms. Clark are professionals but are not "acceptable medical sources," and therefore the ALJ's treatment of their

FINDINGS AND RECOMMENDATIONS    20                           {JWM}

testimony is held to the same standard as a lay witness. *See* 20 C.F.R. § 416.913(d)(1) (2014).

When determining the weight of multiple lay witnesses' testimony, the ALJ is not required to "discuss every witness's testimony on a individualized, witness-by-witness basis [ . . . ] if the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina v. Astrue*, 674 F.3d 1104, 1114 (9th Cir. 2012) (citing *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 2009) (holding that because "the ALJ provided clear and convincing reasons for rejecting [the claimant's] own subjective complaints, and because [the lay witness's] testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting [the lay witness's] testimony")). One reason an ALJ may discount lay testimony is that it conflicts with medical evidence. *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir.1984).

In establishing Holcomb's residual functioning capacity, the ALJ stated:

> I give little weight to the claimant's mother, Mr. Farley, Mr. Harmon, Ms. Clark, Mr. Neibling, and Dr. Neibling's opinions because they lack the qualifications of the consultative examiner and the medical expert, and because of the claimant's substance abuse and overall lack of credibility.

(Admin. R. at 23.) The ALJ did not outright reject or discredit the testimony of the Lay Witnesses. Instead, the ALJ simply gave that testimony less weight than the testimony of Dr. Scott and Dr. Haynes. The ALJ provided three reasons, germane to each of the Lay Witnesses, for giving their evidence little weight: First, the ALJ found their testimony, to the extent it contradicted the testimony of the consultative examiner and the medical expert, carried little weight because that evidence contradicted medical evidence. Second, the ALJ found the Lay Witnesses' testimony to bear little weight to the extent it discussed Holcomb's concentration issues because those witnesses

did not consider his drug use. Finally, the ALJ found the Lay Witnesses' testimony held little weight in so far as it relied on Holcomb's subjective statements. Therefore, the ALJ did not err in giving little weight to the testimony of the Lay Witnesses.

IV.    Vocational Expert Testimony.

Holcomb argues that the ALJ erred in framing his hypothetical questions for the vocational expert, because the question did not include all of the limitations caused by his impairments. The omitted limitations, however, were only those that the ALJ found did not exist. Because the ALJ included the limitations that he found to exist, and because his findings were made without error, the hypothetical was appropriate. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) ("The ALJ did not err in omitting the other limitations that Rollins had claimed, but had failed to prove.")

*Conclusion*

The Commissioner's findings on Holcomb's disabilities, considering the record as a whole, are supported by substantial evidence. The decision of the Commissioner should be affirmed.

*Scheduling Order*

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **October 7, 2014**. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 22nd day of September, 2014.


                                          /s/ John V. Acosta
                                         JOHN V. ACOSTA
                                    United States Magistrate Judge